# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| BELTWAY PAVING COMPANY, INC., | * |
| Plaintiff, | * |
| v. | * |
| PRUCO LIFE INSURANCE | * |
| COMPANY, ET AL., | * |
| Defendants. | * |

Civil No. 21-264-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Beltway Paving Company ("Plaintiff" or "Beltway") brought suit against Pruco Life Insurance Company ("Pruco") and Lisa Moore (collectively "Defendants") alleging that the Estate of Timothy Moore ("the Estate") has been unjustly enriched by receipt of $1 million in insurance proceeds from a policy for which Beltway paid all the premiums.  ECF 25 (second amended complaint).[1]  Plaintiff seeks payment of $1 million from the Estate and a declaratory judgment ordering that Beltway is the owner and beneficiary and the sole entity/individual entitled to receive the policy's death benefits.  *Id.* at 5.  Pending before the Court are several motions.  Beltway filed a Motion for Summary Judgment.  ECF 139.  Pruco then filed an Opposition to Beltway's Motion and a Cross-Motion for Summary Judgment.  ECF 144.  Lisa Moore also filed an Opposition to Beltway's Motion and a Cross-Motion for Summary Judgment.  ECF 145.  Beltway then filed a Response in Opposition to the Cross-Motions for Summary Judgment.  ECF 148.  Pruco and Lisa

---

[1] Plaintiff filed the initial complaint on February 1, 2021.  ECF 1.  Plaintiff then filed an amended complaint on May 6, 2021.  ECF 11.  The second amended complaint, which is the operative complaint in this case, was filed on June 7, 2021.  ECF 25.

Moore filed replies.  *See* ECF 149 (Pruco Reply); ECF 150 (Lisa Moore Reply).  All filings include memoranda of law and exhibits.[2]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons stated below, the Cross-Motions for Summary Judgment filed by Pruco and Lisa Moore, ECFs 144 and 145, are **GRANTED** and Beltway's Motion for Summary Judgment, ECF 139, is **DENIED**.

## I.    BACKGROUND

### A.    Facts

Beltway is an asphalt contractor in Maryland.  ECF 139-2 (Murphy Dep.), at 2, 27:3.  Prior to April 2013, Michael Williams ("Williams") owned 800 shares of Beltway and Timothy Moore ("Moore") owned 200 shares.  ECF 139-3 (Agreement of Stock Re-Purchase), at 8–9; ECF 139-2, at 32, 208:18–22.  On April 1, 2013, Beltway redeemed Williams's shares and redistributed the shares to Moore and Christine Williams-Murphy[3] ("Murphy"), who is Williams's daughter.  ECF 139-2, at 8, 50:10–20, at 24, 141:20–142:8; ECF 139-3, at 8.  The redemption transaction allegedly resulted in a promissory note in which Beltway agreed to pay $800,800 to Williams in exchange for his shares.  *See* ECF 139-3, at 2 ("Payment of the balance shall be made and secured by a promissory note from Buyer to Seller.").  Murphy testified that "[t]here was a promissory note to [Williams] for the shares from Beltway Paving," but when asked if a promissory note was produced in this litigation, she responded: "I don't think we could find it, but we did find a lot of surrounding information where it mentions it."  ECF 139-2, at 26, 148:6–21; *see also id.* at 30, 179:15–17 ("Q: And, again, you do not currently have a copy of that promissory note, do you? A:

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] The parties refer to Christine Williams-Murphy as "Williams," "Williams-Murphy," and "Murphy."  The Court will refer to Christine Williams-Murphy as "Murphy."

I can't put my hands on it, no."). According to the Stock Re-Purchase Agreement, Beltway agreed to pay Williams "in Three Hundred Sixty-Three (363) equal weekly installments of Two Thousand Two [Hundred] Dollars [] ($2,200.00) with interest at zero percent (0%) per annum."[4] *See* ECF 139-3, at 2; *see also* ECF 139-2, at 29, 178:1–179:1 (explaining that Beltway owed Williams a total of $800,800 for his stock).

Following the redemption transaction, Murphy became the majority shareholder, with 600 units of stock and Moore became the minority shareholder, with 400 units of stock. ECF 139-3, at 8. Moore subsequently distributed an additional 67 shares of stock to Murphy, increasing her interest to 667 shares and decreasing his interest to 333 shares. ECF 139-4 (Stockholders' Agreement), at 1.

Beltway, through the surviving shareholder, had an obligation under the Stockholders' Agreement to redeem the stock of a deceased shareholder. *See* ECF 139-4, at 4 ("Upon the death of a Stockholder (the 'Decedent'), the surviving Stockholder shall purchase, and the Decedent's personal representatives shall sell, all of the shares of Common Stock owned of record and beneficially by the Decedent at the time of the Decedent's death (the 'Decedent Shares.')"). The Stockholders' Agreement also included language indicating that life insurance proceeds would be used to fulfill Beltway's obligation under the buy-sell agreement. *Id.* at 5 ("The dollar amount of the Decedent Purchase Price multiplied by the number of Decedent Shares (the 'Aggregate Decedent Purchase Price') shall be paid in cash on the Decedent Closing Date to the extent of the dollar amount of the net (*i.e.*, after tax, including by way of example, any alternative minimum tax liability imposed on the Corporation by virtue of its receipt of such proceeds) cash proceeds

---

[4] Beltway also agreed to pay Williams $2,200 "in cash upon the signing of [the] Agreement." ECF 139-3, at 2.

received by the surviving Stockholder under the Life Policy insuring the life of the Decedent (the 'Net Life Insurance Proceeds.')"); *see also* ECF 139-2, at 13–14, 62:21–63:2 ("Q: What are you referring to when you say buy-sell agreement? A: In case one of us [a stockholder] passed away, we needed life insurance on each other."); *id.* at 14, 63:6–22 (explaining that the insurance was to protect the company from buy-sell agreements, which governed "how shares would be distributed to remaining owners upon the death or some other event concerning one of the owners").  In short, according to Plaintiff, "[t]he insurance policies were intended to pay out to Beltway [] to support its stock redemption obligations."  ECF 139, at 4 (citations omitted).

Murphy testified that the Beltway shareholders wanted to obtain at least $2 million in the event of Moore's death and $3 million in the event of Murphy's death.  *See* ECF 139-2, at 10, 59:3–13; *see also* ECF 139-8 (Schubert[5] email dated March 9, 2020), at 1 ("From our conversation [Moore] and [Murphy] wanted to have $500k go to their spouses directly and for Beltway to have $2m for [Moore] and $3m for [Murphy] as part of the Buy/Sell agreement.").  Murphy further clarified that the $3 million policy was "[f]or the buy-sell agreements in case of [Murphy's] passing, [so that] [] Moore would have enough money to replace [Murphy] and to purchase [her] stock shares."  ECF 139-2, at 11, 60:2–5.

In 2015, Murphy participated in the acquisition of life insurance policy L9224497 (the "2015 Policy") for $1 million, which was executed on Moore's life.  ECF 139-6, at 1–3.  The 2015 Policy listed Beltway as the owner and beneficiary, and Moore as the insured.[6]  ECF 139-6.

---

[5] Craig Schubert is a "duly licensed insurance producer," who is contracted with Prudential Insurance Company of America ("Prudential') as a statutory agent and has been authorized and appointed by Prudential and its wholly owned subsidiary, Pruco, for the sale of life insurance policies by Pruco in Maryland.  ECF 144-4, at 2 ¶ 1.

[6] The Court notes that Beltway is not explicitly listed on the documents Plaintiff attached to the Motion, ECF 139-6, at 1–3, but both Moore and Murphy's signatures are found on the document,

Beltway paid all of the premiums for the policy.  ECF 139-2, at 3, 40:11–22.  As part of the application, Murphy completed a Business Supplement.  ECF 144-6 (Business Supplement), at 5. As stated on the face of the Business Supplement, this form is required by Pruco "where the purpose of the insurance is for business purposes such as buy-sell [agreements], key person coverage or as collateral for a business loan."  *See id.*; *see also* ECF 144-4 (Schubert Decl.), at 3 ¶ 4.  In accordance with the terms of the 2015 Policy, the $1,000,000 death benefit provided by the 2015 Policy was paid to Beltway upon Moore's death.  ECF 144-10, at 2.

On September 28, 2017, Moore and Williams obtained a second life insurance policy, policy L9522718 (the "2017 Policy"), for $1 million on Moore's life.  ECF 139-7 (2017 life insurance policy), at 1, 18.  The application for the 2017 Policy, which was signed by Moore in his individual capacity, lists Moore as the owner of the policy and the insured, and lists Williams as the sole beneficiary.[7]  *See* ECF 139-7; *see also* ECF 144-4, at 4 ¶ 5.  Murphy testified that she was not involved in applying for or approving the 2017 Policy.[8]  ECF 139-2, at 16, 65:15–22.  The "Beneficiary" provision of the 2017 Policy stated, in pertinent part: "If none [of the designated beneficiaries] survives the Insured, we will pay [the death benefit] in one sum to the Insured's estate."  ECF 139-7, at 8.  The 2017 Policy also explained how to change a beneficiary:

> You may designate or change a beneficiary by sending us a request in a form that meets our needs.  We may ask you to send us the contract to be endorsed.  If we receive your request, and the contract if we ask for it, we will file and record the

---

and the Defendants concede in their briefs that Beltway is the owner and beneficiary of policy L9224497.  *See* ECF 144, at 8; ECF 145, at 6.

[7] There appears to be no dispute that Williams was listed in his individual capacity.  *See* ECF 148, at 9 (arguing that Beltway's principals intended Beltway to receive the proceeds of the 2017 Policy, rather than Williams in his individual capacity).

[8] At the time the policy was applied for and issued, Murphy was the CEO and President of Beltway.  ECF 139-2, at 17, 66:10–17.

change at our Home Office and, unless a different future effective date is specified
by you, it will take effect on the date you signed the request.

*Id.* There was no Business Supplement completed as part of the 2017 Policy. ECF 144, at 10
(citing ECF 144-4, at 4 ¶ 6; ECF 144-5, at 4 ¶ 6). Schubert affirmed that "had Williams or Moore
indicated that the purpose of the 2017 Policy was for a buy-sell arrangement or key-man insurance,
[Schubert] would have required that a Business Supplement be completed as part of this
application." ECF 144-4, at 4 ¶ 6. The application also instructs: "[i]f insurance is for business
purposes, also complete the Business Insurance Supplement." ECF 139-7, at 18. Beltway paid all
of the premiums for the 2017 policy. ECF 139-2, at 3, 40:11–16, at 33, 223:7–10, at 37, 247:16–
19.

Murphy learned of the existence of the 2017 Policy when she got the first bill for it in 2017.
*Id.* at 19, 68:16–20. Murphy believed that the 2017 Policy was a "key man policy," which meant
that it was "intended to go to Beltway Paving." *Id.* at 21, 70:3–15. According to Murphy, she
paid some of the bills for the 2017 Policy on behalf of Beltway, with the "understanding that this
was intended to be a key man policy." *Id.* at 20–21, 69:67–70:4. Murphy alleges that she based
her understanding of the 2017 Policy off her discussions with Moore and Williams. *Id.* at 21,
70:8–13. Sometime in 2019 or 2020, based on another alleged discussion with Moore, Murphy
realized "there was an issue with the policy." *Id.* at 19, 68:6–15. Williams died unexpectedly in
February 2020, predeceasing Moore. *Id.* at 34, 224:7–10.

Murphy testified that between 2019 and 2020, Moore told Murphy to "call [the insurance
brokers] . . . to get the insurance policies straight and the beneficiaries." ECF 139-2, at 18, 67:5–
10. According to Plaintiff, "it was not until Moore informed Murphy [sometime between 2019
and 2020] that the beneficiaries needed to be changed for the [2017] policy that she realized []
Williams's name, rather than Beltway Paving or Michael Williams in an official capacity, was

listed as beneficiary on the policy." ECF 139, at 5 (citing ECF 139-2, at 17–18, 66:18–67:4, at 19, 68:6–20, at 23, 80:12–16, at 27, 158:7–19, at 34, 224:7–17). Murphy also indicated that, after Williams unexpectedly died in February 2020, Moore "told [Murphy] that one of [the policies] was in Michael Williams's name and that we had to make sure it was changed." ECF 139-2, at 67:11–16; *see also* ECF 139-5 (Schubert Dep.), at 3, 46:11–16 ("Q: Who believed that Beltway Paving should be the beneficiary for this policy? A: That was merely an option . . . Williams had passed away[,] [s]o he was still listed as beneficiary, so a new beneficiary needed to be named.").

On March 5, 2020, insurance brokers Craig Schubert and Denice Warfield[9] met with Moore and Murphy to review their various existing life insurance policies. ECF 145-2 (Supp. Schubert Dep.), at 13–15, 36:19–38:14; ECF 144-4, at 5 ¶ 10; ECF 144-5 (Warfield Decl.), at 5 ¶ 10. After the meeting, Schubert sent an email to Moore and Murphy, which is reproduced below, to memorialize the discussion.[10] ECF 139-8, at 1.

---

[9] Denice Warfield, like Schubert, is a "duly licensed insurance producer," who is contracted with Prudential Insurance Company of America ("Prudential') as a statutory agent and has been authorized and appointed by Prudential and its wholly owned subsidiary, Pruco, for the sale of life insurance policies by Pruco in Maryland. ECF 144-5, at 2 ¶ 1.

[10] The email addresses were redacted by the Court to protect the parties' privacy.

**From:** Craig Schubert <███████████████████>
**Sent:** Monday, March 09, 2020 1:32 PM EDT
**To:** Tim Moore <█████████████>; Christine <█████████████████████████████>
**CC:** Denice Warfield <████████████████████████████████████>
**Subject:** Buy/Sell and Key Person protection
**Attachment(s):** "Tim Moore Founders.pdf"

Good morning Christine and Tim,

Please see the attached illustration. I went through several scenarios and feel this Index Universal Life policy will work better cost wise than the Investment Grade policy I left with you. This is the same policy Christine has. I will summarize the current policies and the recommended changes.

From our conversation Tim and Christine wanted to have $500k go to their spouses directly and for Beltway to have $2m for Tim and $3m for Christine as part of the Buy/Sell agreement. Also having policies with cash value to help create a fund for buying out shares due to disability, retirement or voluntary separation.

**Tim's policies**

| Company | Death Benefit | Annual Premium | Beneficiary | Type/Expires | Recommended change |
|---------|--------------|----------------|-------------|--------------|-------------------|
| Prudential | $1,000,000 | $14,076.40 | Mickey | 10 yr term exp. 09/2027 | Convert to Index Universal Life; change owner and beneficiary to Beltway |
| Prudential | $1,000,000 | $13,930.80 | Beltway | 20 yr term exp. 07/2035 | No changes |
| US Life | $1,000,000 | $3800 ?? | Beltway/ Michelle | 20 yr term exp.? | Change beneficiary from Beltway to Williams family, leave Michelle for 50% |
| Protective | $1,000,000 | $18,000 (approx.) | Michelle (think) | Term that goes up each year | Reduce to $500,000 and name Williams family beneficiary |

**Christine's policies**

| Company | Death Benefit | Annual Premium | Beneficiary | Type/Expires | Recommended change |
|---------|--------------|----------------|-------------|--------------|-------------------|
| Prudential | $1,000,000 | $7,200.00 | Kevin | Index Universal life | Change owner and beneficiary to Beltway |
| Prudential | $500,000 | $2,928.00 | Beltway | Index Universal life | No changes |
| Prudential | $500,000 | $868.40 | Beltway of Southern MD | 30 yr term exp. 02/2048 | No changes |
| Prudential | $200,000 | $1408.44 | Kevin | 30 yr Return of Premium 02/2042 | No changes |

**Action items from above for Tim**
1. Converting Tim's current 10 year term policy to Index Universal Life, premium $36,000 year.
2. Reducing Tim's Protective Life to $500,000 will decrease premium about $9000 year.
3. Various ownership and beneficiary changes.
4. Both 1 & 2 above will result in additional cost of $13,000 year (36,000 minus $14,076 minus $9000)
5. Beneficiaries – Beltway $2m; Michelle $500k; Williams family $1m

**Action items from above for Christine**
1. Purchase new 30 year term for $1,500,000, premium $248.94 monthly; owner and beneficiary Beltway Paving Company.
2. Purchase new 30 year term for $300,000, premium $56.79 monthly; owner and beneficiary Kevin.
3. Ownership and beneficiary change to current $1m policy.
4. Beneficiaries – Beltway Pacing Company $3m; Kevin $500k; Beltway Paving of Southern MD $500k

I will call to discuss.

Respectfully,

Craig Schubert, RFC®

According to Plaintiff, this email reveals that "in addition to confirming the intent that Beltway Paving have $2 [million] in benefits for Moore's death and $3 [million] for Murphy's in conjunction with the buy/sell agreements and Beltway Paving's obligation to redeem their shares in the event of their deaths, Schubert confirmed Beltway Paving's desire to change the owner and beneficiary [of the 2017 Policy] to Beltway Paving." ECF 139, at 5. Schubert, on the other hand, maintains that "there was no agreement on a beneficiary change reached at that March 5, 2020 meeting." *See* ECF 144-4, at 6 ¶ 11. More specifically, Schubert indicates that "[Murphy] believed she and her brother should be made the beneficiaries of the 2017 Policy[, while] [] Moore believed his wife should be made the beneficiary of the 2017 Policy." *Id.* According to Schubert, "[a]s no

decisions regarding the 2017 Policy [] [were] made at the March 5, 2020 meeting, [he] sent a follow up email . . . in which [he] set forth recommendations and proposed action steps based on the [] meeting." *Id.* ¶ 12. Neither Moore nor Murphy responded to Schubert's email. *Id.*; *see also* ECF 144-5, at 6 ¶ 12 (affirming that "no decisions regarding the 2017 Policy or other life insurance policies were made at the [] meeting and "to [Warfield's] knowledge, neither Moore nor [] Murphy responded to [Schubert's follow-up] email"). Murphy testified that she could not remember the March 5, 2020 meeting. ECF 144-2, at 7–8, 226:14–227:20. Schubert indicated that he "called [] Murphy on March 12, 2020, regarding how they would like to proceed." ECF 144-4, at 6 ¶ 13. According to Schubert, Murphy "stated . . . that they were in negotiations to sell Beltway, and therefore that they did not want to make any changes to the 2017 Policy at that time." *Id.*

By emails dated June 1, 2020 and September 8, 2020, Warfield followed up with Moore and Murphy requesting a call to discuss the life insurance policies. ECF 144-8 (Warfield email, dated June 1, 2020); ECF 144-9 (Warfield email, dated September 8, 2020). Neither Moore nor Murphy responded to these emails. ECF 144-4, at 6 ¶ 14; ECF 144-5, at 6 ¶ 13. Schubert affirmed that "[a]t no time during the March 5, 2020 meeting (or at any time thereafter) did Moore or [] Murphy authorize or instruct me, or to my knowledge Agent Warfield, [] to proceed with a beneficiary change." ECF 144-4, at 7 ¶ 16. Schubert further indicated that "[h]ad [he] received such instruction from Moore, [he] would have assisted Moore in the completion of a beneficiary change." *Id.*

Beltway paid all premiums for the 2017 Policy from inception until Moore's death benefits were due. *See* ECF 139-9 (checks from Beltway to Prudential), at 1–11. Moore died on November 2, 2020. ECF 139-2, at 35, 229:14–18. Murphy testified that Moore "told [Murphy] that he was going to change [the beneficiary]" before Williams's death on February 9, 2020. ECF 139-2, at

34, 224:7–17.  Murphy also testified, however, that she did not personally take any steps to make any changes to the beneficiary to the 2017 Policy between March 9, 2020 and November 2, 2020. *Id.* at 35, 229:14–18.  When asked, "do you know if [] Moore took any steps between February 9, 2020, and his death on November 2nd, 2020, to make any changes to the beneficiary to the 20[17] Policy," Murphy responded, "I don't know."  *Id.* at 35–36, 229:19–230:1.  Further, Murphy acknowledged that Williams was the listed beneficiary to the 2017 Policy.  *See id.* at 33, 223:16–20 ("Q: [C]an we agree that the 2017 policy, even though you may disagree with the intent, lists Michael Williams as the beneficiary to the 2017 policy?" A: Correct.").

After Moore's death, Murphy spoke with Schubert about the 2017 Policy, and Schubert told Murphy the policy would be paid to Moore's Estate.[11]  ECF 139-2, at 36, 230:10–20.  On November 13, 2020, Beltway, through counsel, then advised Pruco that "[t]he benefits [of the 2017 Policy] were intended by the policy owner to be paid to the company or [] Williams, in his capacity as President of the company upon the death of the insured."  ECF 139-10 (Beltway's email to Prudential, dated November 13, 2020), at 1.  Pruco responded by first "confirming that at the time of [Moore's] ("Insured") death the policy names Michael B. Williams as primary beneficiary and the estate of Timothy S. Moore as contingent beneficiary."  ECF 139-11 (Prudential's email to Beltway, dated November 20, 2020), at 1.  Pruco then indicated that it was "contractually obligated to pay the proceeds on [the 2017] policy [] to the estate of the Insured," and notified Beltway that "there have not been any changes made to the beneficiary arrangement since inception."  *Id.*  Pruco ultimately paid the proceeds of the 2017 Policy to the Estate on February 3, 2021.  ECF 139-12

---

[11] The Court again notes that the "Beneficiary" provision of the 2017 Policy stated, in pertinent part: "If none [of the designated beneficiaries] survives the Insured, we will pay [the death benefit] in one sum to the Insured's estate."  ECF 139-7, at 8.

(Pruco's check to the Estate of Timothy Moore), at 1.  On March 16, 2021, Beltway asserted a claim in the Estate's probate administration.  ECF 139-13 (Notice of Claim), at 1.

### B.    Procedural History

On February 1, 2021, Beltway filed suit against Pruco.  ECF 1.  On May 6, 2021, Plaintiff filed an amended complaint, adding the Estate as a Defendant.  ECF 11.  On June 7, 2021, Plaintiff filed a second amended complaint.  ECF 25.  Both Pruco and the Estate filed separate motions to dismiss the second amended complaint under Rules 12(b)(1) and 12(b)(6).  ECF 28 (Estate motion to dismiss); ECF 29 (Pruco motion to dismiss).  On September 6, 2022, Judge Grimm denied both motions to dismiss, finding that the Court has personal jurisdiction over the Estate and factual issues precluded dismissal at that early stage of litigation.  ECF 37.  On April 27, 2023, Pruco filed a crossclaim against the Estate.[12]  ECF 75.  As described above, each party has now filed a cross-motion for summary judgment.  *See* ECF 139; ECF 144; ECF 145.

## II.    LEGAL STANDARD

### A.    Rule 56(a)

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

---

[12] Specifically, Pruco requested that "if it is judicially determined that Pruco is liable to Plaintiff in any amount, then Pruco asserts that Cross-Defendant Estate has been unjustly enriched by the payment of the Death Benefit Proceeds, and the Estate's retention and/or disbursement of the Death Benefit Proceeds would be unjust and inequitable under these circumstances," and thus Pruco requests "judgment in its favor and against [the] Estate for damages equal to the amount of Death Benefit Proceeds and for costs and reasonable attorneys' fees."  ECF 75-1, at 9–10.

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials,

without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).  The Court may rely only on facts supported by the record, not simply assertions raised in the pleadings.  *Bouchat*, 346 F.3d at 522.

## B.    Choice of Law

The parties assume, without discussion, that Maryland law applies to this case.  A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules.  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state.") (citing *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983)).

In a contract claim, including one for unjust enrichment, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract.  *Todd v. Xoom Energy Maryland, LLC*, Civ. No. GJH-15-154, 2016 WL 727108, at *6 (D. Md. Feb. 22, 2016) (citations omitted); *Griffith Energy Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 120 A.3d 808, 821 (Md. App. 2015); *see also Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995); *U.S. Life Ins. Co. v. Wilson*, 18 A.3d 110, 116 (Md. App. 2011); *Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. 2002).  Here, the parties appear to agree that Maryland law covers the contract-related count of unjust enrichment.  *See* ECF 139, at 7; ECF 144, at 21; ECF 145, at 13.  Accordingly, the Court will apply Maryland law in addressing the claim.

III.    **ANALYSIS**

Beltway asserts an unjust enrichment claim against the Estate and seeks a declaratory judgment ordering that Beltway is the owner and beneficiary and the sole entity/individual entitled to receive the 2017 Policy's death benefits.  ECF 25, at 5.  To prevail on its unjust enrichment claim against the Estate, Beltway must prove (1) a benefit was conferred upon the Estate by Beltway; (2) the Estate knew of the benefit; and (3) the Estate accepted or retained the benefit under circumstances that make it inequitable for the Estate to do so without payment of its value. *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000).

Under the 2017 Policy at issue in this case, the insured "may designate or change a beneficiary by sending [Pruco] a request in a form that meets [Pruco's] needs."  ECF 139-7, at 8. The Policy further specifies that, "[i]f [Pruco] receive[s] [the insured's] request, and the contract if [Pruco] ask[s] for it, [Pruco] will file and record the change at [Pruco's] Home Office and, unless a different future effective date is specified by [the insured], it will take effect on the date [the insured] signed the request."  *Id.*  The parties do not dispute that no beneficiary change form was ever submitted to Pruco and that Moore did not follow the procedure provided by the plain language of the policy.  *See* ECF 139-2, at 33, 223:16–20 ("Q: [C]an we agree that the 2017 policy, even though you may disagree with the intent, lists Michael Williams as the beneficiary to the 2017 policy?" A: Correct."); *see also id.* at 35, 229:14–230:17.  But this does not end the Court's analysis.  Even though Moore did not comply with the Policy's stated change-of-beneficiary requirements, the question remains whether Schubert's March 9, 2020 email, along with Murphy's testimony that Beltway was the intended recipient of the 2017 Policy proceeds, entitles Beltway to equitable relief.

Where contractual procedures governing an insurance policy to change beneficiaries have not been followed, some jurisdictions recognize an equitable rule to effectuate a change of

beneficiary.  The Court of Appeals of Maryland (now called the Supreme Court of Maryland) has "recognized the 'equitable rule' that when an insured 'has complied with all of the requirements of the rules for the purposes of making a substitution of beneficiaries within his power, he has done all that a court of equity demands.'"  *Lingham v. Harmon*, 502 F. Supp. 302, 306 (D. Md. 1980) (citing *Daly v. Daly*, 113 A. 643, 647 (1921)).  Under Maryland law, in order for a change of beneficiary to be effective despite the insured's failure to actually enact the change, the insured "must have determined to change the beneficiary and must have done everything to the best of his ability thereafter to effect the change."  *Id.* at 307 (citations omitted).

To show that the insured has done everything to the best of his ability to effect the change, courts typically require evidence that circumstances beyond the insured's control make it impossible, or nearly impossible, for an actual change to have been made before the insured's death.  *See Lingham*, 502 F. Supp. at 307 (finding that where insured's mother signed beneficiary change form on behalf of dying daughter based on daughter's express instructions, change was effective despite failure to comply with rule that only the insured could sign the form); *Cotter v. United States*, 78 F. Supp. 495, 498 (D. Md. 1948) (holding that where soldier serving during World War II requested to change the beneficiary of his policy from his father to his new wife, but was given the wrong form preventing the change from becoming effective prior to his death, he had done everything "reasonably within his power" to make the change); *Daly,* 113 A. at 647 (finding that where insured directed employer to change beneficiary designation but insurance agent advised that he did not have the change of beneficiary blanks at that time and would give the insured a blank as soon as he got one, but the agent failed to follow through before the insured's unexpected death, the insured did "all in his power to effect the change").

The case law is clear: in order for a court to find, based on its equitable powers, that the insured desired someone *besides* the designated written beneficiary to receive the life insurance proceeds, there must be competent evidence that "the insured had taken steps to change the beneficiary on his insurance policy, but, after the insured's death, it became apparent that the change had never been effected through no fault of the insured." *In re Rief*, Civ. No. WMN-07-2284, 2008 WL 168951, at *6 (D. Md. Jan. 15, 2008). "A mere unexecuted intent to substitute a new beneficiary is not enough, without more, to effect such a change." *Urquhart v. Alexander*, 147 A.2d 213, 218 (Md. 1958). "[C]ourts will not complete for an individual that which he reasonably and without justifiable excuse could have accomplished." *United Servs. Life Ins. v. Moss*, 303 F. Supp. 72, 76 (W.D. Va. 1969) (holding change in beneficiary was not effective where the insured "held [the] form and the policy for over two and a half years without sending them to be endorsed," and the failure to deliver the form was unexplained). Indeed, where "the failure to deliver the policy is due to the insured's negligence or remains unexplained, the attempted change is held not to be effective." *Id.*

Here, there is no evidence from which the Court can infer that Moore was determined to change Beltway to the beneficiary of the 2017 Policy and did everything in his power to do so.[13]

---

[13] As a threshold matter, Defendants appear to contest the admissibility of testimony by Murphy about statements that Moore allegedly made to Murphy. *See* ECF 145, at 7–8 (arguing that certain assertions by Murphy are "based entirely on inadmissible hearsay from individuals who are both deceased"); *see also* ECF 144, at 24–25. Specifically, the Estate maintains that alleged statements by Moore indicating that the purpose of the 2017 Policy was to fund the buy/sell agreement and that the 2017 Policy beneficiary needed to be changed are inadmissible hearsay, along with Murphy's testimony that Moore directed Murphy to call the insurance brokers to change the beneficiaries. ECF 145, at 7. Plaintiff contends that "Murphy provided competent testimony based on her personal knowledge and neither Pruco nor the Estate provided competent controverting testimony." ECF 148, at 9. The Court finds that, even if these assertions were admissible pursuant to a hearsay exception or because the assertions are not being offered for their truth, none of these allegations are essential to the outcome on summary judgment. Thus, even assuming Moore told Murphy the purpose of the policy was to compensate Beltway under the buy/sell agreement and

To the contrary, record evidence shows that Moore and Murphy discussed changing the beneficiary, but no definitive decisions were made, and in fact, Murphy and Moore disagreed about who the beneficiary of the 2017 Policy should be.[14]  *See* ECF 144-4, at 6 ¶¶ 11, 12; ECF 139-8, at 1.  The evidence also undisputedly shows that Moore did not attempt to change the paperwork to name a new beneficiary, ECF 144-4, at 7 ¶ 16, ECF 144-5, at 6 ¶ 14, ECF 139-2, at 35, 229:19–230:1, and Murphy and Moore knew Williams was the beneficiary, at least as of March 2020, if not before.  ECF 139-2, at 17–18, 66:18–67:16, at 27, 158:7–19; ECF 139-8, at 1; ECF 145-2, at 13–15, 36:19–38:14.

---

directed Murphy to call the insurance agents to change the beneficiaries in both 2019 and 2020, neither of these assertions change the facts central to the unjust enrichment claim.  As explained in more detail below, even if Moore intended to change the beneficiary to Beltway leading up to, or even during, the March 5, 2020 meeting, there is no evidence that he then acted on this intention in any way.  Thus, the Court finds it unnecessary to engage in an extended analysis about the admissibility of certain statements by Murphy related to her purported conversations with Moore.  Even if those statements were deemed admissible, they do not change the outcome under the Maryland test for unjust enrichment.  *Lingham*, 502 F. Supp. at 307 (holding that the insured must have done "everything to the best of his ability thereafter to effect the change").  There is no evidence that Moore did anything besides participate in a March 2020 meeting with Schubert and Murphy that ended in a "recommended change" of altering the beneficiary of the 2017 Policy to Beltway.  In the eight months that followed, Moore failed to respond to emails from Schubert and Warfield and there is no evidence that Moore took any action in response to the "recommended change" or "action items" listed in Schubert's email.  As such, no reasonable juror could find, even considering Murphy's testimony about Moore's alleged statements to her, that Moore did "everything to the best of his ability" to change the beneficiary to Beltway.  It is, therefore, unnecessary to make a conclusory ruling about the admissibility of the statements.

[14] Murphy testified at her deposition that she does not remember the March 5, 2020 meeting with Schubert, nor does she remember speaking with Schubert after he sent the follow-up e-mail.  ECF 145-1, at 33, 226:14-19, at 34–35, 227:21–228:6; *see also* ECF 148, at 13 (acknowledging in Plaintiff's reply brief that "[Murphy] did not recall the details of the March 5, 2020 meeting or the existence of [] Schubert's email . . .").  Beltway thus has no witness who can testify from personal knowledge about the facts and circumstances surrounding the March 5, 2020 meeting or Schubert's follow-up email.  As such, Schubert's assertion that his March 9, 2020 email was intended only to provide "the option of potentially changing the beneficiary of the 2017 Policy to Beltway," but that there was "no agreement on a beneficiary change reached at that March 5, 2020 meeting," is effectively undisputed because Murphy contends she does not remember the meeting or any follow-up to the meeting.  ECF 144-4, at 6 ¶¶ 11, 12.

Plaintiff's reliance on *Kowalski v. Jackson National Life Insurance Company*, 981 F. Supp. 2d 1309 (S.D. Fla. 2013) is unpersuasive.  Plaintiff cites *Kowalski* for the proposition that "[b]ecause none of the insured's (Timothy Moore) heirs contributed anything to the payment of the policy premiums, it would be inequitable [] for the benefit to be retained."  ECF 148, at 3 (citing *Kowalski*, 981 F. Supp. 2d at 1322); *see also id.* at 4 ("[T]he Court found the insured's estate [in *Kowalski*] had been unjustly enriched *because* it had not contributed to any of the premium payments.") (emphasis in original).  The Estate responds that this Court "cannot adopt Beltway's perverse reading of [*Kowalski*] to require only payment of premiums by an employer and receipt of proceeds by an employee's estate to show inequitable circumstances."  ECF 150, at 4.  Though it may not describe it in the same terms, the Court agrees with the Estate's general point.[15]  The mere fact that Beltway paid the premiums on the policy cannot, by itself, show inequitable circumstances, particularly given that evidence shows that Beltway paid premiums for personal life insurance policies for employees as a "perk" of employment.  *See* ECF 144-4, at 7 ¶ 15 ("It is common for small business[es] to pay insurance premiums for personal insurance policies for their principals and their families as a 'perk,' and it my understanding that, in fact, Beltway paid the premiums for personal policies for Williams, Murphy, and others in her family.").  Even Murphy acknowledged this: "I believe [] [Moore and Williams] also wanted to have smaller [life insurance policies] as, like, a company perk for our families.  I think it was $500 a piece."  ECF 145-1, at 16, 59:8–20.  As Maryland case law makes clear, inequitable circumstances do not arise

---

[15] In *Kowalski*, unlike here, the plaintiff "continued to pay the policy premiums because she believed—albeit mistakenly—that she was both the policy owner and the beneficiary."  *Kowalski*, 981 F. Supp. 2d at 1322.  Here, by contrast, Plaintiff admitted in its summary judgment motion that "Murphy continued making payments on behalf of Beltway [] after learning the company was not the named beneficiary[.]"  ECF 139, at 9.  Even if *Kowalski* was not distinguishable, the Court is not persuaded by its reasoning, and the case is not binding on this Court, which Plaintiff acknowledges.  ECF 148, at 4.

merely from an insured intending, but ultimately failing, to change a beneficiary. The standard undoubtedly demands more; the insured must have done "everything to the best of his ability" to change the beneficiary. *Lingham*, 502 F. Supp. at 307. Even assuming, as Plaintiff urges, that Moore expressed an intent to change the beneficiary to the 2017 Policy, *Urquhart* stands for the proposition that "express[ing] an intent on several occasions to designate [] [a] new beneficiary," but never "[getting] around to doing so" is not enough to effect such a change.[16] *Urquhart*, 147 A.2d at 218.

Moreover, where there is no explanation or excuse for failing to change the beneficiary, the Court cannot conclude that the insured did all that he could to meet the conditions for change required by the policy. *See Reid v. Durboraw*, 272 F. 99, 102 (4th Cir. 1921). In *Reid*, the Fourth

---

[16] The Court notes that in ruling on the motions to dismiss, Judge Grimm held that "*Urquhart* addresses circumstances in which a policy holder is aware of the identity of the beneficiary, makes promises to change the identity of the beneficiary, but does not in fact take any steps to do so." ECF 37, at 16 (citation omitted). Judge Grimm continued: "[h]ere, by contrast, the Second Amended Complaint alleges that [] Moore had always intended for Beltway to be the Policy's beneficiary and was never aware that Beltway was not the beneficiary prior his death." *Id.* at 16–17. The Court, at the motion to dismiss stage, was confined to the pleadings and obligated to construe the facts in the light most favorable to Plaintiff. As such, the Court held that "the reasoning in *Urquhart*, at least based on the record currently before the Court, does not apply in this case." *Id.* at 17. However, the Court now finds on summary judgment, with the benefit of a full record post-discovery, that there is no genuine dispute that Moore knew, prior to his death, that Williams was the named beneficiary on the 2017 Policy. Indeed, Murphy testified that after Williams unexpectedly died in February 2020, Moore "told [Murphy] that one of [the policies] was in Michael Williams's name and that we had to make sure it was changed." ECF 139-2, at 18, 67:11–16. Further, Schubert's March 9, 2020 email demonstrates that both Moore and Murphy were aware that Williams was the beneficiary of the 2017 Policy because Schubert's "recommended change" indicated that the 2017 Policy beneficiary could be changed to Beltway. ECF 139-8, at 1; *see also* ECF 139, at 5 (stating that "it was not until Moore informed Murphy that the beneficiaries needed to be changed for the policy that she realized [] Williams's name, rather than Beltway [] or [] Williams in an official capacity, was listed as beneficiary on the policy"). As such, the reasoning in *Urquhart* applies given the undisputed evidence that, contrary to Plaintiff's argument in the pleadings, Moore *was aware* prior to his death that Williams was the beneficiary of the 2017 Policy. As such, "[a] mere unexecuted intent to substitute a new beneficiary is not enough, without more, to effect such a change." *Urquhart*, 147 A.2d at 218.

Circuit held that where an insured requested change-of-beneficiary forms from his insurer and thereafter executed the forms but failed to return the forms to the insurer prior to his death, there was no valid change of beneficiary. *Id.* At the time of the insured's death, the policy was in a trunk in his apartment. *Id.* The court noted that "it appears that a period of more than a month elapsed, with a formal request duly executed in his hands and the policy also at hand, without any effort to send them forward to the home office for [e]ndorsement of the change." *Id.* The Fourth Circuit explained that "[n]o excuse or explanation [for the failure to send in the forms] has been suggested, either in the evidence or in the argument, except procrastination of the insured." *Id.* Accordingly, the Fourth Circuit held that it "see[s] no escape, either on principle or authority, from holding that no reasonable effort was made to exercise the power of changing the beneficiary in the method contracted for, and that the original [beneficiary] appointment [] must stand." *Id.*

The Fourth Circuit's reasoning, albeit from 1921, compels the same conclusion here. Moore, like the insured in *Reid*, knew, at least as of March 2020, who the designated beneficiary was. ECF 139-2, at 18, 67:11–16; ECF 139-8, at 1. Additionally, Moore received follow-up correspondence from Schubert in March 2020, and from Warfield in both June and September 2020, requesting that Murphy and Moore set up a call with the insurance brokers to go over the insurance policies. *Id.*; ECF 144-8; ECF 144-9. Had Moore wished to change the beneficiary, he had ample opportunities—and reminders—to do so. Instead, Moore never responded to the emails from Schubert or Warfield. ECF 144-4, at 6 ¶¶ 12, 14; ECF 144-5, at 6 ¶ 13. Even more extreme than the circumstances in *Reid*, where a month passed without any effort to change the beneficiary, Moore allowed nearly *eight months* to elapse without taking any action to change the beneficiary despite his explicit knowledge from the March 5, 2020 meeting that Williams was the named beneficiary and the Estate was the contingent beneficiary. There is no credible explanation in the

evidence for Moore's failure to make the change. Thus, the Court concludes that even if Moore *intended* to change the 2017 Policy beneficiary at some point, he did not do anything to exercise his power to change the beneficiary, let alone "everything to the best of his ability" to effect the change.

Plaintiff argues for the first time on summary judgment that Moore instructed Schubert to make a change to the 2017 Policy beneficiary during the March 5, 2020 meeting. *See* ECF 148, at 5 (asserting that Schubert's March 9, 2020 email "evinces not only [] Moore and [] Murphy's desire that the policy beneficiary change to Beltway Paving, but their explicit instruction that [] Schubert do so"). Plaintiff appears to further contend that despite Moore's explicit instruction to make the beneficiary change, Schubert failed to do so. *Id.* As an initial matter, no reasonable juror could find that Schubert's email is evidence that he was instructed by Moore to change the policy. The relevant portion of the email was labeled "*recommended* change[s]" and contained action items for both Murphy and Moore. ECF 139-8, at 1 (emphasis added). No reasonable jury could find that the email alone is sufficient evidence that Schubert was unambiguously instructed by Moore to change the 2017 Policy. This is particularly true in light of record evidence showing that a change of beneficiary must be initiated by sending a request in written form to Pruco, ECF 139-7, at 8, that Moore and Murphy disagreed about who the beneficiary of the 2017 Policy should be and failed to reach an agreement at the March 5, 2020 meeting, ECF 144-4, at 6 ¶ 11, that Murphy does not remember the details of the March 5, 2020 meeting, ECF 145-1, at 33, 226:14-19, at 34–35, 227:21–228:6, and that Moore failed to respond to Schubert's email or Warfield's follow-up emails requesting a meeting to discuss how the insurance policies were structured. ECF 144-4, at 6 ¶ 12; ECF 144-5, at 6 ¶ 13. Additionally, Plaintiff does not even attempt to explain why Schubert failed to process the change despite an allegedly explicit instruction to do so.

The Estate points out, and the Court agrees, that Plaintiff's argument at the summary judgment stage that Moore instructed Schubert to make the change at the March 5, 2020 meeting is a departure from the pleadings and the responsive admission given by Plaintiff during discovery. *See* ECF 25, at 3 (claiming that "Moore, having failed to understand that Williams was listed as the beneficiary of the policy rather than Beltway Paving or that the benefits would not be payable to the company upon Moore's death as intended, did not make adjustments to the beneficiary"); ECF 145-7 at 4 (admitting that Plaintiff has "no evidence that any party attempted to change the beneficiary of the Policy at any time prior to [] Moore's death"). Additionally, the assertion that Schubert was instructed by Moore to change the beneficiary at the March 5, 2020 meeting contradicts Murphy's deposition testimony, which states that Murphy does not remember the March 5, 2020 meeting. ECF 145-1, at 33, 226:14-19, at 34–35, 227:21–228:6; *see also* ECF 148, at 13 (acknowledging in Plaintiff's reply brief that "[Murphy] did not recall the details of the March 5, 2020 meeting or the existence of [] Schubert's email . . ."). Thus, there can be no genuine dispute of material fact over whether Schubert was instructed by Moore to change the beneficiary at the March 5, 2020 meeting because Murphy testified that she cannot remember if such a meeting took place and Plaintiff offers no other evidence, besides Schubert's follow-up email, to demonstrate that such an instruction occurred.

To be clear, the March 9, 2020 email from Schubert does not, as Plaintiff contends, evince "in no uncertain terms," Moore's desire to change the beneficiary. ECF 148, at 5. Rather, the email has a column titled, "*recommended* change" and includes a sentence stating, "change owner and beneficiary to Beltway" under the 2017 Policy. ECF 139-8, at 1 (emphasis added). The email also includes a list titled "Action Items from above for [Moore]." *Id.* Action item number three states: "various ownership and beneficiary changes." *Id.* Even viewing the evidence in the light

most favorable to Plaintiff and assuming that the email from Schubert on March 9, 2020 establishes that Moore *intended* to change the beneficiary to Beltway after the March 5, 2020 meeting, the record undisputedly demonstrates that Moore did not take any action after the March 5, 2020 meeting to change the beneficiary despite Moore's knowledge that Williams was the beneficiary. *See Urquhart*, 147 A.2d at 218 (finding that although the insured "expressed an intent on several occasions to designate his wife as the beneficiary," the record demonstrated that "the insured made no attempt at any time, either directly or otherwise, to effect a delivery of the policy to his wife" and therefore there was no justification for reformation of the policy). What is more, the record shows that Moore had multiple opportunities to change the beneficiary, as Warfield reached out via email two separate times, in June and September 2020, requesting that Moore and Murphy set up a meeting with Warfield and Schubert to discuss their insurance policies.[17] ECF 144-8; ECF 144-9.

Further, unlike in *Cotter,* where a solider requested a change in beneficiary, but was given the wrong form preventing the change from becoming effective, or in *Daly*, where the insured requested a change to his beneficiary, but the agent did not have the change of beneficiary "blanks" and was not able to get one to the insured before his unexpected death, Beltway has produced no evidence indicating that Moore attempted to change the beneficiary but circumstances outside of his control prevented such a change. In fact, Schubert affirmed that "[h]ad [he] received such instruction from Moore, [he] would have assisted Moore in the completion of a beneficiary change."[18] ECF 144-4, at 7 ¶ 16. Plaintiff has produced no evidence to support the conclusory

---

[17] The Court notes that Murphy's intent to change the beneficiary is irrelevant. The inquiry focuses on whether the insured—Moore—did everything in his power to enact a change in beneficiary.

[18] Warfield affirmed the same. ECF 144-5, at 6 ¶ 14.

assertion that Schubert and Warfield simply ignored Moore's alleged request to change the beneficiary. And Plaintiff has not even attempted to explain *why* Schubert and Warfield purportedly failed to comply with Moore's alleged explicit instructions. To the contrary, Schubert affirmed that "[a]t no time during the March 5, 2020 meeting (or at any time thereafter) did Moore or [] Murphy authorize or instruct me, or to my knowledge Agent Warfield, [] to proceed with a beneficiary change." ECF 144-4, at 7 ¶ 16. In light of the record evidence, there is no genuine dispute of material fact over whether Moore instructed the insurance brokers to change the beneficiary at the March 2020 meeting. Plaintiff admitted in discovery that there were no attempts to change the beneficiary prior to Moore's death, and even ignoring this admission, and further ignoring the fact that this claim was not included in Plaintiff's second amended complaint, and Murphy testified she does not remember the March 5, 2020 meeting, Plaintiff does not produce any competent evidence to support the conclusory assertion that the insurance agents had been instructed by Moore to change the policy.[19]

Even if the Court were to credit Plaintiff's revised theory of the case—that Moore intended to change the beneficiary to Beltway during the March 5, 2020 meeting and instructed Schubert to do so—merely directing Schubert to change the beneficiary would not have changed the policy beneficiary under the explicit terms of the contract in the absence of evidence that he submitted a "form that meets [Pruco's] needs." *See* ECF 139-7, at 8 ("You may designate or change a beneficiary by sending us a request in a form that meets our needs. We may ask you to send us the contract to be endorsed. If we receive your request, and the contract if we ask for it, we will file

---

[19] Again, Schubert's March 5, 2020 email does not provide the evidence Plaintiff claims it does. Nowhere in the email does Schubert indicate that he was instructed by Moore to change the beneficiary to Beltway. Rather, he titled the column "recommended change," listed action items for Moore, which included "various ownership and beneficiary changes," and indicated he would "call to discuss." ECF 139-8, at 1.

and record the change at our Home Office and, unless a different future effective date is specified by you, it will take effect on the date you signed the request.").  In the absence of any evidence that Moore submitted and signed a "form that meets [Pruco's] needs," ECF 139-7, at 8, Plaintiff's uncorroborated assertion that Moore "instructed Schubert" to make the change does not create a genuine dispute of material fact because there is no evidence that this "instruction" was accompanied by necessary contractual elements—namely, a signed request form—that would enable Schubert to make the change.  *Cf. Cotter*, 78 F. Supp. at 495 (finding beneficiary change effective where insured executed and sent change-of-beneficiary form to insurance company, but it was discovered after the insured's death that he had been provided the wrong forms).

In short, Beltway has not generated a dispute of material fact to show that Moore did not know who the beneficiary was prior to his death, or that he mistakenly believed it was Beltway. ECF 139-2, at 27, 158:7–19.  Rather, the undisputed evidence shows that as of March 5, 2020, both Moore and Murphy knew the 2017 Policy listed Williams as the beneficiary and that if the policy remained unaltered, the entire benefit would be left to Moore's estate.  ECF 139-2, at 17–18, 66:18–67:16, at 27, 158:7–19; ECF 139-8, at 1; ECF 145-2, at 13–15, 36:19–38:14; ECF 144-4, at 5 ¶ 10.[20]  There is no evidence showing that Moore did not understand the consequences of his inaction.  Additionally, there is no competent evidence showing that Moore took any action to change the beneficiary between March 2020 and his death in November 2020.  *See* ECF 139-2, at 35, 229:19–230:1; ECF 144-4, at 7 ¶ 16.  Plaintiff does not provide any explanation for Moore's

---

[20] Specifically, Schubert asserted that at the March 5, 2020 meeting, he and Warfield "explicitly discussed with Moore and [] Murphy that Williams was the sole named beneficiary of the 2017 Policy, and that if the beneficiary for the 2017 Policy was not changed, the death benefit would be payable to Moore's estate upon Moore's death."  ECF 144-4, at 5 ¶ 10.

inaction, and it is well-established that "courts will not complete for an individual that which he reasonably and without justifiable excuse could have accomplished." *Moss*, 303 F. Supp. at 76.

The record establishes that Moore did not take any action to change the beneficiary of the 2017 Policy despite his knowledge that Williams was the named beneficiary and that, in the absence of a change, the proceeds would be left to his Estate. Thus, the Court finds that Moore did not do anything, let alone "everything to the best of his ability" to effect the change. *Lingham*, 502 F. Supp. at 307. Under these circumstances, no reasonable juror could find that the Estate accepted or retained a benefit under inequitable circumstances. *Berry & Gould, P.A.*, 757 A.2d at 113. Accordingly, Plaintiff's claim that the Estate was unjustly enriched, and Beltway is entitled to the insurance proceeds of the 2017 Policy fails as a matter of law.[21]

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Cross-Motions for Summary Judgment filed by Pruco and Lisa Moore, ECFs 144 and 145, are **GRANTED** and Beltway's Motion for Summary Judgment, ECF 139, is **DENIED**.

A separate implementing Order will issue.

Dated: <u>February 19, 2025</u>                    <u>        /s/        </u>
                                                          Brendan A. Hurson
                                                          United States District Judge

---

[21] Defendants' remaining arguments, namely that the request for declaratory judgment is moot, ECF 144, at 16, Pruco is shielded from liability based on the doctrine of good faith discharge, *id.* at 18, and the Stock Redemption Agreement released the Estate from liability, ECF 145, at 18, are rendered academic in light of the Court's finding that the Estate was not unjustly enriched. The Court thus declines to address those arguments. Additionally, because the Court does not reach the question of whether the Stock Redemption Agreement has any bearing on the instant litigation, the Court also declines to reach the issue of attorneys' fees under the Stock Redemption Agreement. *Id.* at 19.